Henry A. Hudson, J.
The petitioner, pursuant to an order to show cause returnable on the 3d day of June, 1958, brought the two above proceedings against the Health Officers of the Cities of Fulton and Oswego, New York. Each of the proceed *852 ings was in the nature of mandamus. The petitioner sought an order directing each of the Health Officers to issue to the petitioner a permit to sell milk and milk products in their respective cities. In the alternative petitioner sought an order directing the Health Officers to perform their respective duties pursuant to the provisions of the Agriculture and Markets Law and the State Sanitary Code in relation to the application filed by the petitioner for a permit allowing it to distribute milk and milk products in the Cities of Fulton and Oswego, Oswego County, New York. Upon the return date of the application the petitioner requested a hearing at which it could submit proof in support thereof. A hearing was held in the Village of Pulaski, New York on July 2, 1958 at which time testimony of the respondents, the president of Byrne Dairy, Inc., the assistant treasurer of the petitioner and the assistant director of quality control of the Dairymen’s League Cooperative Association, Inc., was taken before the court.
While there are actually before the court two separate applications, the facts although different in respect to each are nevertheless so similar that I believe both applications can be considered in one opinion. I believe that this should be done for the reason that the questions of law which are involved are identical.
I will first discuss the questions of fact insofar as they apply to both applications.
The petitioner operates some 32 retail supermarkets in central New York. Its main office is in Syracuse, New York. Its stores in Oswego County are located, one at 121 South First Street in the City of Fulton, one at 168 First Street in the City of Oswego, New York and one in the Village of Pulaski. The petitioner commenced business under its present corporate name January 1, 1957 at which time it succeeded, through corporate reorganization, a predecessor which had operated under the name, Cooperative P & C Family Foods, Inc. This predecessor company had conducted the stores for several years prior to this reorganization.
On April 15, 1958, the petitioner made separate applications to the Health Officers of the Cities of Fulton and Oswego, New York for a dealer’s permit allowing it to sell milk obtained by it from among others, the Dairymen’s League Cooperative Assn., Inc., and Byrne Dairy, Inc., both of Syracuse, New York. These corporations will-hereinafter be referred to as Dairymen’s League and Byrne Dairy. Upon the hearing it was conceded by all parties that as far as the present proceeding was concerned it would be solely directed to the right of the *853 petitioner to obtain milk either from the Dairymen’s League or Byrne Dairy, it being conceded that all other dealers mentioned in the application were not in any way involved in the merits of the application. Under date of January 7, 1957, Official Order No. 133 of the Department of Agriculture and Markets, Division of Milk Control become effective. This order provided that for the purpose of issuing licenses in pursuance of section 258 of the Agriculture and Markets Law, each county in the State of New York was designated as a natural marketing area.
Byrne Dairy holds a license for the period of April 1, 1958 to March 31, 1959, issued by the Department of Agriculture and Markets to purchase, distribute and sell milk and cream in the markets listed in its application which includes among others, Oswego County, New York. Dairymen’s League holds no distributor’s license for Oswego County.
Under date of June 26,1958, by letter addressed to petitioner’s attorneys, the acting chief of the milk and restaurant sanitation section of the Department of Health of the State of New York certified that the City of Syracuse Health Department had issued permits to process to the Dairymen’s League and Byrne Dairy and that such records were acceptable as a basis for certification for sale in other areas.
I will next discuss the questions of fact insofar as they apply to the proceeding instituted against the Health Officer of the City of Fulton, New York. The Health Officer took petitioner’s 1958 application up with members of the Board of Health and although no formal action was taken, a decision was made that the application would be denied. No notice of the denial of the application was given to the petitioner. On May 2, 1958 the present proceeding was instituted. The petitioner sells in its Fulton store approximately 4,000 quarts of milk a week.
Petitioner’s predecessor had been issued a storekeeper’s permit by F. A. Fox, Health Officer of the City of Fulton, New York, on October 23, 1956 with an expiration date of December 31, 1956. This permit authorized the predecessor company to sell milk and cream obtained from the Dairymen’s League and Athens Dairy Company of Athens, Pennsylvania. While operating under such permit the petitioner’s predecessor obtained mill?; solely from the Dairymen’s League at Syracuse, New York.
The practice followed by petitioner and its predecessor, which obtained milk for its Syracuse stores from Dairymen’s League Syracuse plant, was to send its trucks to the Syracuse plant *854 and then transport the milk to its stores in Pulton and Pulaski, Oswego County. At that time approximately 3,000 quarts of milk a week, obtained as above were sold in the Pulton store. During 1957 an application was made by petitioner for a further permit. This was denied.
No action was taken by the Health Officer or Board of Health of the City of Pulton before deciding to deny the petitioner’s 1958 application except that at a meeting of the board it was decided that the supply of milk was adequate and that there was no need for a further supply. No facts or information were given to the Commissioner of Agriculture and Markets in respect thereto.
I will next discuss the questions of fact insofar as they apply to the proceeding instituted against the Health Officer of the City of Oswego. The Health Officer did not take petitioner’s 1958 application up with the members of the Board of Health immediately. He did make some inquiry verbally of some of the dealers supplying milk in the City of Oswego as to the amount of the available milk supply for the City of Oswego. No formal action was taken or decision made upon the application and no facts or information were given to the Commissioner of Agriculture and Markets in respect thereto prior to the 2d day of May, 1958 at which time the present proceeding was instituted. The first meeting of the Board of Health oí the City of Oswego following receipt of petitioner’s 1958 application, was held on May 14, 1958 at which time no action was taken other than an informal discussion and the Board of Health advised of the institution of the present proceeding. No steps were taken by the Health Officer of the City of Oswego tc ascertain if the Dairymen’s League or Byrne Dairy held permits to process or were licensed. No inspection or investigation oi the plants of either company was made. A letter was writter by the Health Officer to the Commissioner of Agriculture anc Markets June 30, 1958, asking for instructions as to what tc do in respect to the application. The Commissioner repliec under date of July 7, 1958 stating that in view of the presen' application and the hearing on July 2, 1958 that he did no consider it proper to discuss the matter pending the court’s decision. The only data obtained were statements furnishec late in May, 1958 to the Health Officer by some six dealers distributing milk to the City of Oswego and an unsigned state ment containing a composite report for all dealers. None o: the statements was sworn to. They were furnished to th< Health Officer on behalf of the dealers for the apparent purposi of indicating that there was an ample supply of milk availabL *855 in the City of Oswego so that the petitioner’s application should be denied for that reason. None of this information was submitted in any form to the Commissioner of Agriculture and Markets for any of the purposes set forth in section 258-j of the Agriculture and Markets Law. The petitioner sells in its Oswego store 5,000 quarts of milk a week.
I fiad that the above facts were established at the hearing held July 2, 1958 either by oral testimony or by documentary evidence received in the form of exhibits.
The Health Officers of both the Cities of Fulton and Oswego have either refused or failed to issue a permit to the P So C Food Market, Inc., for the reason that they are of the opinion that they are unable to satisfy the Commissioner of Agriculture and Markets that the requirements of section 258-j of the Agriculture and Markets Law have been met by the petitioner.
Section 258-j of the Agriculture and Markets Law reads in part as follows: “ No health officer of any county, city or village of this state shall hereafter approve any premises on which milk is produced or any plant in which milk is handled or authorize the shipment of milk from such premises or plant for sale or use within this state without first satisfying the commissioner that such proposed added milk supply is reasonably needed for such municipality, will not deprive another municipality of a supply, present or future, more conveniently related to it, and.that such supply can be inspected and kept under inspection without undue expense. ’ ’
Regulation 9 of section C of chapter 3 of the State Sanitary Code reads in part as follows:
u Regulation 9. Permit to distribute required. No person except a storekeeper shall sell, offer for sale or deliver milk or milk products to consumers or storekeepers without holding a permit to distribute milk or milk products, issued by the health officer having jurisdiction, unless such milk or milk products are to be consumed on the premises where sold.
‘ ‘ A permit to distribute shall be granted only for the sale of milk or milk products processed in a plant operated under a permit to process issued by a permit issuing official or obtained from a broker holding a permit for resale. Such processing plants or brokers shall be listed in the permit to distribute at the time of issuance and no other processing plants or brokers shall be used as sources without the permission of the health officer.
“A permit to distribute milk or milk products shall be granted only to a person who conforms to the requirements of this chapter. A permit to distribute milk shall be granted only *856 to a person who holds a license for such sale issued by the commissioner of agriculture and markets or to a person exempt from such licensing requirements in conformity with the Agriculture and Markets Law.
# * *
“ Before granting a permit to distribute milk or milk products, the health officer shall satisfy himself that any broker or processing plant listed in the application is operating in compliance with the provisions of this chapter. For this purpose the health officer may accept as sufficient evidence of compliance a statement by the state commissioner of health, or his authorized representative, that such plant holds a valid permit to process or an official approval under the provisions of the Sanitary Code of the City of New York or that such broker holds a valid permit. The health officer may make or cause to be made by his authorized representative such investigations as he deems necessary, * * *
“No storekeeper or vending machine operator shall sell mill?: or milk products unless such milk or milk products are obtained from a person holding a permit to distribute, issued by the health officer having jurisdiction unless such storekeeper or vending machine operator holds a permit to distribute.” The duties of local Boards of Health are set forth in section 308 of the Public Health Law:
“ Subject to the provisions of this chapter and of the sanitary code, every local board of health shall:
“ (a) prescribe the duties and powers of the local health officer, who shall be its chief executive officer;
“ (b) direct the local health officer in the performance of his duties;
* # #
“ (d) make and publish, from time to time, such orders and regulations, not inconsistent with the provisions of the sanitary •code, as it may deem necessary and proper for the preservation of life and health and the execution and enforcement of this chapter in the municipality ’ ’.
The general powers and duties of the local Health Officer are set forth in section 324 of the Public Health Law. Those relating to his duties in the present case are:
“1. In addition to such other duties as may be lawfully imposed upon him and subject to the provisions of this chapter and the sanitary code, every health officer shall:
*857 “ (e) enforce within his jurisdiction the provisions of this chapter and the sanitary code
There are three leading cases which have been called to my attention involving substantially similar circumstances that have been passed upon by the Special Term. No others have come to my attention. {Dellwood Dairy Co. v. Brown, 106 N. Y. S. 2d 749.)
This case involved the issuance of a permit by the County Health Officer to an out of county dairy company, which had acquired by purchase, a local dairy business and proposed to supply milk from its own processing plant without the county. The out of county dairy had obtained a license to distribute from the Commissioner of Agriculture and Markets before applying to the local Health Officer for a permit. The local Health Officer refused to issue a health permit upon the ground that his investigation had satisfied him that there was an adequate supply of milk within the county; that he could not tell whether another municipality would be deprived of its milk supply and that the new supply could not be inspected without undue expense. The Health Officer pointed out that he was of the opinion that the Commissioner’s action in issuing a license was taken without due consideration and without weighing the merits. In commenting on the action of the Health Officer, the court stated at page 753: “ The statute requires that the health officer satisfy the commissioner affirmatively on each of those three subjects before he issues a permit. I consider that that means that the health officer must ascertain the facts and communicate them to the commissioner. No procedure is defined, therefore any substantial compliance with the law without regard to form should suffice. When the health officer has submitted his facts, the commissioner must indicate to the health officer whether he is satisfied affirmatively with respect to the three subjects so that the health officer may proceed to act upon the application under consideration. If the commissioner is so satisfied and notifies the health officer to that effect, the health officer may issue the permit (all other requirements being met by applicant) but if the commissioner be not so satisfied the prohibitory features of the statute become operative and no permit may be issued.”
The court held that the Health Officer was not justified in refusing to issue the health permit and also that the Commissioner of Agriculture and Markets had not met his obligations under the statute in that he refused to take any action because he had not been properly informed by the Health Officer in respect to the requirements of section 258-j. Accordingly the *858 court annulled the Health Officer’s decision in denying the application and remanded the matter for further consideration and action in accordance with the directives in the opinion.
This case (Matter of Washburn’s Dairy v. Mansfield, 200 Misc. 1017) involved an application by a milk dealer in the City of Gloversville, New York, which also operated a retail store in the City of Johnstown, selling milk at retail. The dealer was licensed in respect to its Gloversville operation and applied for an extension to permit it to sell other dairy products in this store in Johnstown. After a hearing, the Commissioner of Agriculture and Markets issued an extension of petitioner’s license to sell dairy products in its Johnstown store. Petitioner then applied to the local Health Officer of the City of Johnstown for the required permit. This was denied for the reason that there was an adequate milk supply then available for the City of Johnstown and that the issuance of a permit would require the City of Johnstown to incur unnecessary expense in making inspections. The court stated, at page 1019: “It appears to this court that the distribution of milk and a determination concerning surpluses and shortages is controlled solely by the Commissioner of Agriculture and Markets ” and at page 1020: “ It is this court’s opinion that the provisions of section 258-j must be read together with all of the other provisions of article 21 of the Agriculture and Markets Law and particularly section 258-c and section 257. It would appear that the control of distribution was intended to be left with the Commissioner of Agriculture and Markets and that the various health departments ’ and health officers’ function was to make proper inspections to control the quality and safeguard the health of the users within the territory under their jurisdiction.”
The court held that there might be a possible question of fact requiring the taking of evidence as to the involvement of the city in undue expense for inspection and directed that in the absence of an application for such a hearing, an order would be granted directing the issuance of a permit by the Health Officer to the petitioner.
In Matter of Abrams v. Martuscello (8 Misc 2d 282) a case in which a milk dealer in Fultonville, New York, selling most of his milk in New York City, applied to the Department of Agriculture and Markets for a permit to sell milk at wholesale in a number of cities and towns in the vicinity of Fultonville, New York. The Commissioner issued an extension of the dealer’s license and the dealer then applied to the various Health Officers of the various communities involved. Several issued permits forthwith, others refused. The dealer thereupon insti *859 tuted proceedings to review the action of the Health Officers who refused to issue permits. The court,’ following the Wash-burn’s Dairy case (200 Misc 1017, supra), held that the control of distribution was with the Commissioner of Agriculture and Markets and that the only question, therefore, remaining for the Health Officers was that of undue expense for inspection. The court then pointed out that under recent amendments to the Sanitary Code (ch. 3, § C, reg. 9), the policy of the State Department of Health clearly was to relieve local municipalities of the expense of making inspections and authorized the local Health Officer to accept the certification of the State Department of Health that a plant held a valid permit to process or other official approval, by the local authorities in its own locality. The court held that the action of the Health Officers in refusing to issue the permit, while based on an honest concern to eliminate what might he destructive competition, was nevertheless arbitrary and, therefore, the Health Officer’s action was annulled and he was directed to issue a health permit.
The court in the Dellwood Dairy case (106 N. Y. S. 2d 749, 752, supra) and in the Matter of Abrams case (8 Misc 2d 282, 284, supra) in referring to the lack of clarity of the language of section 258-j of the Agriculture and Markets Law, stated: “ The language of the statute leaves much to he desired in clearness and in direction addressed to those public officials expected to give it effect. ’ ’
While it is true that the language of section 258-j could be clearer, I believe that a careful reading of the above statute and authorities will permit a clear interpretation of the intent of the Legislature in enacting section 258-j of the Agriculture and Markets Law.
The question of the distribution of milk and the determination of surpluses and shortages are solely within the province of the Commissioner of Agriculture and Markets. (Agriculture and Markets Law, §§ 254, 257, 258-c, 258-j; Dellwood Dairy Co. v. Brown, 106 N. Y. S. 2d 749, supra; Washburn’s Dairy v. Mansfield, 200 Misc. 1017, supra; Matter of Abrams v. Martuscello, 8 Misc 2d 282, supra.)
These questions are not within the scope of the powers and duties of the local boards of health or local health officers. (Public Health Law, §§ 308, 324; Washburn’s Dairy v. Mansfield, supra.)
The question of the inspection of a milk supply and the expense thereof, may, under certain circumstances, such as those involving small individual producers (farmers) or small local processors, come within the scope and province of the local *860 health department. However, in the case of large processors such as we are here concerned with (Dairymen’s League), the question of inspection because of the expense and work involved, should as a practical matter come within the purview of the State Commissioner of Health or those local health officials primarily involved. The provisions of regulation 9 of section C of chapter 3 of the State Sanitary Code authorize local Health Officers to accept the statement of the State Commissioner of Health as to compliance. This relieves local communities under the supervision of local health officers of any problem either as to work or expense in the matter of inspection. (Matter of Abrams v. Martuscello, 8 Misc 2d 282, supra.)
From a reading of the above-quoted provisions of section 258-j of the Agriculture and Markets Law, the provisions of the State Sanitary Code, sections 308 and 324 of the Public Health Law and the authorities, I am satisfied that a local health officer is not required or expected to first satisfy himself, or in fact to make any determination, in respect to the reasonable need of an added milk supply, the possible interference with a present or future supply of another municipality, or the cost of inspection of a proposed supply in the sense that he is supposed to pass upon those questions in the first instance without regard to an opinion of the Commissioner of Agriculture and Markets or in the sense that he is required as an agent of the Commissioner to make such a determination or to prove to the satisfaction of the Commissioner that the applicant does not come within the provision of section 258-j of the Agriculture and Markets Law. Rather, it seems to me, that the Legislature intended by the language of section 258-j to place a restraint upon the Public Health Officer to the extent that he could not issue a permit unless and until he had obtained the approval of the Commissioner of Agriculture and Markets based upon the Commissioner being satisfied that the three restrictions of section 258-j would not be violated.
An examination of the powers and duties of the Board of Health and the Health Officer would seem to indicate that their part in the issuance of such a permit was primarily concerned with the public health.
It would, therefore, seem that the local Health Officer must first satisfy himself that the issuance of the permit would not adversely affect the public health of the People of his community. If it would, he would be justified in immediately refusing to issue the permit, otherwise he would be required to obtain from the Commissioner of Agriculture and Markets an assurance that the Commissioner was not opposed to the issu *861 anee of the permit for the three reasons specified in section 258-j. Obviously the Health Officer would be justified in submitting to the Commissioner of Agriculture and Markets any facts which had come to his attention either through an investigation of the application itself or from outside sources, that some or all of the three objections specified in section 258-j were applicable and, in the opinion of the Health Officer, might be grounds for the Commissioner’s withholding his consent to the issuance of the permit. Such information might well properly include an expression of opinion by the Health Officer. The important thing, however, would seem to be that the Health Officer must supply facts upon which the Commissioner can act. As was so clearly pointed out in the Dellwood Dairy Co. case, the Washburn’s Dairy case and Matter-of Abrams {supra) once the Commissioner of Agriculture and Markets has acted in passing upon these questions through the issuance of a license, the responsibility of the Health Officer in respect thereto would cease, except that he would still be required to obtain the approval of the commissioner to the issuance of the permit and he still would be justified in submitting to the Commissioner any facts, the knowledge of which might change the opinion of the Commissioner as indicated by the issuance of the original license by the Commissioner.
From the proof presented to the court, it was clear that the local Health Officers were acting in good faith and in the honest belief that the local dealers supplying the Cities of Oswego and Fulton could furnish all the milk that was needed and, therefore, no added supply should be authorized.
As I have pointed out, however, this is not a matter for the determination of the local Health Officer but rather for the Commissioner of Agriculture and Markets.
In the event that any local mill?: dealers were aggrieved by the decision of the Commissioner in issuing a license himself or in approving the issuance of a health permit, the statutes provide an adequate remedy to them.
If the Health Officers felt that the source of supply of the P & C Food markets was from the plant of the Dairymen’s League in the City of Syracuse, where it was licensed to distribute milk, and where the P & C Food Markets operate a number of stores and maintains its head office, and the Health Officers further felt that the P & C Food Markets were improperly purchasing milk from the Dairymen’s League Syracuse plant, ostensibly to sell in their Syracuse stores, instead of in its Fulton and Oswego stores, where the Dairymen’s League was not licensed as a distributor, those facts could be presented *862 by tbe Health Officer to the Commissioner of Agriculture and Markets, who .upon being apprised of the facts, would be in a position to make a proper determination of the questions so raised.
Any question as to the cost of inspection, if such a question sincerely exists in the minds of the Health Officers, could be resolved as was so clearly established upon the hearing by requesting the State Commissioner of Health for a certificate pursuant to the provisions of the State Sanitary Code. Such a certificate was in fact received in evidence upon the hearing.
The application sets forth that the source of supply of the applicant would be, either licensed dealers already supplying the Cities of Fulton and Oswego; the Byrne Dairy Company of Syracuse, which was also licensed to distribute in certain areas in Oswego County, and consequently by the general order of the Commissioner of Agriculture and Markets, dated January 7, 1957, authorized to distribute in any part of Oswego County and the Dairymen’s League, which is not licensed to distribute in Oswego County. It would, therefore, seem that the only source of supply about which any question could arise in the minds of the Health Officers would be the Dairymen’s League.
I am, therefore, of the opinion that the action of the Health Officers of the Cities of Fulton and Oswego, in either refusing to issue a permit to petitioner or in failing to act thereon, was unauthorized. Any action denying the applications is, therefore, annulled. The matter is remitted to the Health Officer of the City of Fulton and to the Health Officer of the City of Oswego for further proceedings in accordance with this opinion.
Order accordingly.